UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>  -against-<br><br>**JEFFREY H. HASTINGS, BRENT N. WHITELEY, BRIAN A. BEATTY, and MICHAEL J. SCOTT,**<br><br>        **Defendants, and**<br><br>**THOMAS W. O'NEILL and LORI E. HASTINGS,**<br><br>        **Relief Defendants.** | **Civil Action No. 1:20-CV-8423**<br><br>**AMENDED COMPLAINT**<br><br>**ECF CASE**<br><br>**(Jury Trial Demanded)** |

For its Amended Complaint against Defendants Jeffrey H. Hastings, Brian A. Beatty, Brent N. Whiteley, and Michael J. Scott, Plaintiff the United States Securities and Exchange Commission (the "SEC") alleges as follows:

**I.  SUMMARY**

1.  This enforcement action arises from an elaborate, four-year-long fraud by SAExploration Holdings, Inc. ("SAE" or the "Company") and four former senior SAE executives, Jeffrey H. Hastings (former Chief Executive Officer and Chairman of SAE's Board of Directors), Brent N. Whiteley (former Chief Financial Officer and General Counsel), Brian A.

Beatty (former Chief Operations Officer and, prior to that, Chief Executive Officer), and Michael J. Scott (former Executive Vice President of Operations). [1]

2.      SAE was a publicly traded seismic data acquisition company.  SAE's customers, mainly large oil and gas companies, hired SAE to collect (or "shoot") proprietary seismic survey data used to identify and assess potential drilling locations.  SAE historically struggled to maintain sufficient cash flow – a problem only exacerbated by a decline in oil prices beginning in late 2014 and into early 2015.

3.      From as early as February 2015 through August 2019 (the "Relevant Period"), SAE and Hastings, Whiteley, Beatty, and Scott (the "SAE Executives") devised and carried out a fraud to improperly recognize approximately $100 million of revenue from transactions with a purportedly legitimate and unrelated customer, Alaskan Seismic Ventures, LLC ("ASV").  In truth, however, ASV was created by the SAE Executives and controlled by Hastings and Whiteley.

4.      The SAE Executives created ASV in May 2015 as a seismic data library company that was purportedly unrelated to SAE.  ASV contracted with SAE to collect seismic data, which ASV would then license to ASV's customers.  Secretly setting up ASV as an unrelated entity offered many benefits, including (i) allowing SAE to ostensibly recognize ASV revenue once SAE "sold" the data to ASV, regardless of whether an actual end-user existed; (ii) enabling ASV to seek a higher amount in certain oil and gas exploration tax credits offered by the State of

---

[1] The SEC's original complaint named SAE as a defendant, but the Court entered final judgment against SAE on December 17, 2020.  ECF No. 44.  SAE is therefore not a defendant in this amended complaint.  The factual allegations in this amended complaint referencing SAE are identical to those included in the SEC's original complaint.  The Court also entered judgments against Whiteley and Scott on June 29, 2021, but both are properly named as defendants in this amended complaint because those judgments are not final.  ECF Nos. 94-95.

Alaska (the "Alaska Tax Credits"); and (iii) circumventing the SAE Board of Directors' and investors' opposition to SAE owning or operating its own seismic data library.

5.      Defendants' fraud was designed to and had the effect of artificially and materially inflating SAE's reported revenue by making it appear that ASV was a significant source of independent revenue.  In fact, and as concealed from SAE's shareholders, debtholders, and the investing public, ASV was a related party controlled by Hastings and Whiteley, and it could not actually pay SAE for all the seismic data.  Nevertheless, between the second quarter of 2015 and the second quarter of 2016, SAE recognized and reported approximately $141 million in revenue from ASV.

6.      To carry out their fraud, beginning in October 2015, Defendants misappropriated $12 million from SAE, approximately half of which ($5.9 million) they used to make a secret equity investment in ASV to induce banks and other financial institutions to provide financing to ASV.  Once it became clear such financing was unlikely to materialize, in late 2015 the Defendants caused ASV to use $5.8 million of the funds earlier misappropriated from SAE to pay down a small fraction of the swelling accounts receivable owed by ASV to SAE – essentially "round tripping" the money misappropriated from SAE to ASV and then back to SAE.  To conceal these fraudulent transactions, the Defendants routed the funds to ASV through a series of shell companies created and controlled by Hastings and Whiteley.

7.      The SAE Executives then pocketed for themselves the balance of the misappropriated funds not transferred to ASV – approximately $6 million.  Whiteley took approximately $4 million for himself, Hastings took another approximately $1 million, and Beatty and Scott kept portions of the rest.

8.      Separately, prior to and during the entire Relevant Period, Whiteley misappropriated from SAE an additional $4 million by submitting (and approving as SAE's CFO) fake invoices, most from a fictitious entity he created, in connection with legal and consulting services that were never provided.

9.      As a result of the Defendants' fraud, SAE's public filings from June 2015 through March 2019 contained numerous materially false and misleading statements.  For example, by recognizing revenue from ASV, SAE overstated its revenue by approximately $100 million, and SAE's financial statements were, therefore, materially false.  SAE's filings during this period were also materially false because they disclosed receivable balances from ASV as if they had been generated from legitimate, substantive transactions with an unrelated company.

10.     In addition, SAE's public filings failed to include ASV in its related party transaction disclosures, failed to include as executive compensation amounts stolen by the SAE Executives, and misrepresented as a legitimate expense the $12 million the Defendants misappropriated.

11.     SAE made similar misstatements to investors in connection with securities offerings it held in 2016, 2017, and 2018.

12.     By engaging in the misconduct described herein, the Defendants violated and aided and abetted the violation of numerous provisions of the antifraud, record keeping, internal controls, and reporting provisions of the federal securities laws, as detailed below.

13.     Each defendant will continue to or again violate the federal securities laws and rules thereunder, unless restrained or enjoined by this Court.

## II.     **JURISDICTION AND VENUE**

14.     This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21 and 27 of

the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa], and 28 U.S.C. § 1331.  Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

15.     Venue lies in this District pursuant to Section 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77v(a) and (c)] and Sections 27(a) and (b) of the Exchange Act [15 U.S.C. § 78aa(a) and (b)] because certain of the acts, practices, and courses of conduct constituting violations alleged herein occurred within the Southern District of New York.  Among other things, SAE's common stock traded on the NASDAQ Stock Market, LLC ("NASDAQ"), which has its headquarters located in this District, and the materially false and misleading statements contained in SAE's public filings and press releases were communicated to persons located in this District.

## III.    SAEXPLORATION HOLDINGS, INC. AND DEFENDANTS

16.     **SAExploration Holdings, Inc. ("SAE")** is a Delaware corporation headquartered in Houston, Texas that provides seismic data acquisition, logistical support, and processing services to customers in the oil and gas industry.  SAE was founded in 2006, and in 2013 became a publicly listed company.  At all times relevant to this Complaint, shares of SAE's common stock traded on the NASDAQ under the symbol "SAEX" and were registered under Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)].  At all times relevant to the Complaint, SAE was required to file with the SEC periodic reports, including annual reports on Form 10-K and quarterly reports on Form 10-Q, pursuant to Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and related rules thereunder.  On June 17, 2020, the NASDAQ suspended trading in

SAE's common stock, and the stock began trading on over-the-counter markets.  On August 21, 2020, NASDAQ delisted SAE's common stock.  On August 27, 2020, SAE and various affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, in the U.S. District Court for the Southern District of Texas, Case No. 20-34306.  On December 17, 2020, the Court in this civil action entered a Final Judgment against SAE, to which SAE consented, and thus SAE is no longer a party to this case.  ECF Nos. 27, 44.

17.    **Jeffrey H. Hastings**, age 65, resides in Anchorage, Alaska, and he has an additional residence in Kelowna, British Columbia, Canada.  From 2016 to August 2019, Hastings was the Chief Executive Officer ("CEO") and Chairman of SAE's Board of Directors ("Board").  From 2013 to 2016, he was Executive Chairman of the Board.  On August 15, 2019, SAE's Board placed Hastings on administrative leave, and he resigned from his role as Director and Chairman of the Board.  Effective November 30, 2019, Hastings resigned from SAE.

18.    **Brent N. Whiteley**, age 57, resides in Houston, Texas.  From 2011 to August 2019, Whiteley was SAE's Chief Financial Officer ("CFO"), General Counsel, and Secretary. He was licensed to practice law in the State of Texas during the Relevant Period.  On August 15, 2019, SAE's Board terminated Whiteley's employment.

19.    **Brian A. Beatty**, age 60, resides in Ontario, Canada.  Beatty founded SAE in 2006.  From 2011 to 2016, Beatty was SAE's President and CEO and a member of the Board. From 2016 to 2019, Beatty was SAE's Chief Operating Officer ("COO") and a member of the Board.  Beatty's employment was terminated by SAE's Board in December 2019.

20.    **Michael J. Scott**, age 64, resides in Alberta, Canada.  Scott was SAE's Executive Vice President of Operations until 2016, when he became a Senior Vice President.  Scott resigned from SAE on September 14, 2020.

IV.    **RELIEF DEFENDANTS**

21.    **Thomas W. O'Neill**, age 56, resides in Houston, Texas.  At all times relevant to this Complaint and until early 2020, O'Neill was married to defendant Brent Whiteley.  O'Neill was also a limited partner in Forza Investments Management, LLC, an entity controlled by Whiteley and described below.

22.    **Lori E. Hastings**, age 64, resides in Anchorage, Alaska, and also has a residence in Kelowna, British Columbia, Canada.  She is, and was at all times relevant to this Complaint, married to defendant Jeffrey Hastings.

V.    **RELATED ENTITIES**

23.    **Alaskan Seismic Ventures, LLC ("ASV")** is an Alaska limited liability company with its principal place of business in Wasilla, Alaska.  ASV was organized in May 2015 to operate as a seismic data library company.  ASV's founder, initial owner, and current 15% owner is a business acquaintance of Hastings.

24.    **Global Equipment Solutions, LLC ("Global Equipment")** was, during the Relevant Period, a Delaware limited liability company, which was created in September 2015. During the Relevant Period, Global Equipment was controlled by Whiteley and had no legitimate business activities.

25.    **Forza Investments Management, LLC ("Forza Investments")** was, during the Relevant Period, a Texas limited liability company that Whiteley created in September 2015. Whiteley recruited a family member to nominally serve as Forza Investments' manager.  During the Relevant Period, Forza Investments was controlled by Whiteley and had no legitimate business activities.

26.     **Madison River Investments, LLC ("Madison River Investments")** was an Alaska limited liability company created in November 2015, and dissolved as of December 2016.  Hastings recruited a close friend to nominally serve as Madison River Investments' manager.  During the Relevant Period, Madison River Investments was controlled by Hastings and had no legitimate business activities.

27.     **Palmyra Energy Ventures Fund I, LP ("Palmyra Energy")** was, during the Relevant Period, a limited partnership with its principal place of business in Houston, Texas. Palmyra Energy was organized in September 2015 by Whiteley's neighbor at Whiteley's direction.

28.     **Speculative Seismic Investments, LLC ("SSI")** was, during the Relevant Period, a Texas limited liability company created in June 2016 and owned by Hastings, Whiteley, and a junior SAE executive.

## VI.     FACTUAL ALLEGATIONS

### A.     The Defendants Created A Purportedly Unaffiliated Data Library Company

29.     From its founding in 2006 to mid-2015, SAE's primary business was to collect proprietary seismic survey data for its customers, which were mostly large oil and gas companies.  SAE's customers would use the seismic data to identify and analyze potential drilling locations.  SAE obtained seismic data from around the world, including in Alaska, Canada, South America, and Southeast Asia, after entering into a definitive agreement with a specific customer to obtain the data.  During this time period, SAE was not a data library, meaning that SAE did not obtain seismic data "on spec" or sell licenses to end-user customers to use that data.

30.     As oil prices dropped in late 2014 and into early 2015, oil exploration and drilling slowed, and few of SAE's customers contracted with SAE for new seismic data acquisition

projects, thereby negatively impacting SAE's business and further straining SAE's ongoing cash-flow issues.

31.     Confronted with these challenges, as early as February through April 2015, the SAE Executives devised a plan to create a data library.  The library would be comprised of seismic data collected in various locations in Alaska, and it would either sell or grant non-exclusive licenses to end-user customers.

32.     SAE's Board, however, had previously opposed the idea of operating a data library due to the risks involved – namely, the Company's incurring of up-front exploration costs without assuring the sale of the collected data.  SAE noteholders also had opposed the data-library business model.

33.     To address these objections, Hastings proposed to the other SAE Executives the idea of creating a special purpose entity ("SPE") to purchase seismic data from SAE and operate the data library, purportedly as a company unaffiliated with SAE.

34.     Creating a purportedly unaffiliated entity to operate the data library offered three primary benefits.

35.     *First*, this structure provided a way for the SAE Executives to circumvent opposition from SAE's board and noteholders to SAE operating as a data library company.

36.     *Second*, if the data library company appeared to be an unaffiliated third party, SAE could potentially recognize the revenue as it "sold" data to the third-party SPE – without having to identify and contract with actual end-user customers.

37.     *Third*, this structure would enable SAE to take maximum advantage of oil and gas exploration tax credits offered by the State of Alaska (the "Alaska Tax Credits").  These credits could be redeemed for cash from the State of Alaska or used as an offset against a qualifying

company's oil-production tax liability for the year in which that liability was incurred. Specifically, the SAE Executives' plan would enable the third-party SPE to apply for and receive the Alaska Tax Credits, and then use the proceeds from the Alaska Tax Credits' redemption to pay SAE for the seismic data, thereby generating actual cash flow for SAE.  Moreover, by having the SPE be (purportedly) unaffiliated, ASV could apply for a higher amount of the Alaska Tax Credits than SAE or a related entity could.  Were SAE to operate its own data library, it would only be able to submit tax credit claims for its own data exploration costs.  As an ostensibly independent data library company, the SPE could claim tax credits for the amounts paid to SAE, which could include SAE's data exploration costs *plus* an amount SAE included as a mark-up on the sale.

38.    Based on telephone and e-mail communications between and among the SAE Executives between February and April 2015, each of Hastings, Whiteley, Beatty, and Scott understood that the data library company (SPE) needed to be a stand-alone business if they wanted to obtain the maximum allowable amount of Alaska Tax Credits.

39.    The SAE Executives began discussing setting up an SPE as early as February 2015.  A PowerPoint regarding Alaska Tax Credit Opportunities that Hastings e-mailed to the other SAE Executives (Whiteley, Beatty, and Scott) on February 20, 2015 discussed: (i) "setting up a SPE or using an entity we already have to hire SAE at a market rate for the work" and (ii) the need to have SAE's data acquisition work "take on the façade of a group shoot to keep investors from crying wolf."  As Hastings, Whiteley, Beatty, and Scott knew, a "group shoot" involved SAE, pursuant to already-executed contracts, acquiring data for multiple customers through a funded shoot, with the data acquired being owned by or exclusively licensed to the group of customers, a practice consistent with SAE's long-standing business model.  Data library

work, on the other hand, would involve shooting data "on spec" in the hopes of selling (or in this case, having the SPE sell) non-exclusive licenses to end-user customers.

40.     In April 2015, Hastings recruited a business acquaintance, a former Director of the State of Alaska Oil and Gas Division, to establish a seismic data library company (the "ASV Owner").  Hastings' business acquaintance formed ASV as an Alaska limited liability company in May 2015.  None of the SAE Executives were identified on ASV's organization documents. The ASV Owner was ASV's sole employee and operated it out of a bedroom in his personal residence.

41.     On July 1, 2015, SAE entered into a Master Services Agreement ("MSA") with ASV, whereby SAE contracted to collect seismic data for ASV.  The ASV Owner signed the MSA for ASV, and Scott signed on behalf of SAE.  Soon thereafter, SAE and ASV executed five work orders pursuant to the MSA for five data exploration locations in Alaska.  Scott signed the first two work orders on behalf of SAE.

42.     Although ASV was structured as a purportedly independent third party, Hastings and Whiteley effectively controlled ASV, as Beatty and Scott knew or were reckless in not knowing.  Whiteley provided administrative and operational support to the ASV Owner, including, for example, providing him with contract templates and identifying potential financing opportunities for ASV.  In addition, Hastings, Whiteley, and Scott located customers to license data from ASV – including customers who previously had purchased data directly from SAE. Indeed, SAE employees even negotiated directly with SAE customers on behalf of ASV.

**B.     The SAE Executives Misappropriated from SAE $12 Million and Covertly Invested Approximately Half In ASV**

43.     Beginning in June 2015, SAE began recognizing as revenue amounts owed to it by ASV.  From the time of ASV's creation in May 2015, the SAE Executives understood that

ASV did not have sufficient funds to pay SAE pursuant to the MSA and that to pay SAE, ASV would need to generate cash from various sources, including finding third parties to license the data collected, monetizing ASV's Alaska Tax Credits, or by otherwise finding sources of equity for ASV.  But, as of the fall of 2015 (and throughout the Relevant Period), ASV had only limited sales to licensees – and nothing close to what SAE recognized as revenue from its sales to ASV. Because ASV lacked funds to pay SAE amounts due under the MSA, SAE's accounts receivable balance from ASV began to increase substantially over time.  For example, by the end of 2015, SAE had recorded $83 million in revenue from ASV – $50 million of which remained outstanding as an account receivable.

44.     By the fall of 2015, the Defendants' prospects of finding independent sources of capital for ASV had decreased significantly.  For one, with SAE's significant assistance, ASV had obtained licensing subscriptions for only $32 million prior to the end of July 2015, of which $26 million was ultimately paid.  The situation had not improved appreciably by the end of the third quarter or in the beginning of the fourth quarter of 2015.

45.     In addition, the Defendants' plan to help ASV monetize the Alaska Tax Credits so ASV could pay SAE's invoices was imperiled by the Governor of Alaska's decision, announced on June 30, 2015, to enact a line-item veto that would significantly reduce the pool of money available to pay out Alaska Tax Credit claims.  As early as May 2015, the SAE Executives were pursuing financing for ASV via loans from banks and other financial institutions, using the anticipated tax credits as support for repayment.  The line-item veto and the fiscal uncertainty it created would make banks less likely to lend money to ASV and threatened to "kill [the SAE Executives'] strategy," as Hastings acknowledged in a July 1, 2015 e-mail to Whiteley, Beatty, and Scott.

46.     In addition, Hastings, Whiteley, Beatty, and Scott knew that, in order for ASV to qualify for the albeit uncertain tax credits, ASV had to certify that all outstanding bills (including amounts owed to SAE) had in fact been paid.

47.     Consequently, to ensure that ASV would have capital to pay SAE's invoices, the SAE Executives devised a secret plan to divert $12 million from SAE and use a portion of those funds to make an indirect equity investment in ASV, which ASV could use to pay SAE, which would, in turn, reduce the accounts receivable balance due from ASV.  Hastings, Whiteley, Beatty, and Scott developed, and communicated about implementing, this plan on conference calls, over e-mail, and occasionally at in-person meetings.

48.     Hastings, Whiteley, Beatty, and Scott knew that an overt investment by SAE in ASV would derail their plan.  At a minimum, it would render ASV an SAE affiliate, requiring consolidation of ASV into SAE's financial statements and precluding the recognition of revenue from SAE's transactions with ASV.  It would also reduce the amount of Alaska Tax Credits that ASV would receive.

49.     By no later than October 2015, the SAE Executives were aware of and actively participating in the illegal plan to make a covert equity investment in ASV, including by devising a plan to route funds from SAE, through various shell companies created and controlled by Whiteley and Hastings, to ASV.  For example, on October 7, 2015, Whiteley e-mailed Hastings, Beatty, and Scott in advance of a conference call and attached an ASV "Organizational Structure" slide, which showed the flow of funds from a "Seismic Contractor" (which the SAE Executives knew at the time to be SAE) to ASV via various entities, including through "[e]quipment rental payments" from SAE to a company called Global Equipment.

50.     Global Equipment was a sham company created by the SAE Executives in September 2015.  In 2015 and 2016, Scott created fake and back-dated purchase orders and supporting documentation purporting to provide for SAE's rental of equipment from Global Equipment for seismic-data surveys SAE had been conducting.  In addition, Whiteley created a website for the sham company Global Equipment.  Beatty knew that Whiteley created the website.  Whiteley also directed the drafting of a fake lease agreement between SAE and Global Equipment and of fake invoices from Global Equipment to SAE.

51.     But Global Equipment did not actually own any such survey equipment, and the non-existent rentals were fabricated in order to provide a cover story for the misappropriation and routing of SAE money to ASV.  For example, in a September 16, 2015 e-mail, Scott informed Whiteley that he had "[done] up daily rental sheets for GES [(Global Equipment)] and [would] do up a PO to match" and instructed Whiteley to include specific rates, equipment, and other terms in the rental agreement Whiteley was drafting.

52.     By early 2016, SAE had booked $12 million in purportedly legitimate business expenses to Global Equipment.

53.     Between October 2015 and December 2016, the SAE Executives all agreed, and Hastings and Whiteley caused, SAE to transfer approximately $12 million to Global Equipment, as follows:

      a.     October 16, 2015:  approximately $6 million

      b.     November 24, 2015:  approximately $750,000

      c.     September 14, 2016:  approximately $2.4 million

      d.     October 28, 2016:  approximately $700,000

      e.     December 6, 2016:  approximately $2.13 million

54.     Although SAE had booked all $12 million in fictitious payables to Global Equipment by early 2016, SAE did not have sufficient cash on hand in early 2016 to pay, among other obligations, the sums ostensibly due to Global Equipment.  Consequently, to increase liquidity, SAE conducted a securities offering in June 2016, wherein SAE offered to exchange senior secured notes issued in June 2015 for new senior secured second lien notes and newly issued SAE common stock, in a 50/50 ratio of debt and equity (the "2016 Exchange Offering"). Nearly all of the holders of the June 2015 notes participated in the exchange, which closed in July 2016.

**C.      The SAE Executives "Round Tripped" Nearly $6 Million Through ASV and Back To SAE To Create the False Impression ASV Was Paying SAE**

55.     After misappropriating the $12 million from SAE using Global Equipment, the SAE Executives sent approximately half through ASV and *back* to SAE to create the false impression that ASV was paying SAE for seismic data.

56.     In October and November 2015, Whiteley caused $6.3 million to be transferred from Global Equipment to two additional shell companies he and Hastings controlled.  First, on or about October 26, 2015, Whiteley caused $3 million to be sent from Global Equipment to Forza Investments, an entity he controlled and created.  Second, in November 2015, Whiteley caused an additional $3.3 million to be sent from Global Equipment to Madison River Investments, an entity Hastings controlled and created.

57.     Next, approximately $6.1 million was transferred from Forza Investments and Madison River Investments – via a $2.8 million transfer in November 2015 and a $3.28 million transfer in December 2015, respectively – to a third entity called Palmyra Energy.  Whiteley directed his neighbor to form Palmyra Energy in or around September 2015, to invest in ASV.

To date, Palmyra Energy has received funds from no sources other than Forza Investments and Madison River Investments.

58.     On or around December 4, 2015, Palmyra Energy used $5.9 million of the $6.1 million from Forza Investments and Madison River Investments to invest in ASV.  As a result, Palmyra Energy – and in turn Whiteley and Hastings, who controlled Palmyra Energy – obtained an 85% ownership stake in ASV.

59.     Later that same day, the SAE Executives completed the round tripping by causing $5.8 million to be sent *back* to SAE, purportedly as payment for the seismic data ASV had purchased from SAE.

60.     On December 2, 2015 – just days before the round tripping of $5.8 million was completed – Hastings e-mailed Whiteley about the "ASV Structure" and attached a chart that Hastings said "may help in [Whiteley's] discussions with the bank."  The attachment was an updated version of the ASV organizational chart Whiteley had sent to Hastings, Beatty, and Scott on October 7, 2015.  The updated chart, among other things, showed the flow of "[e]quipment rental payments" from an unnamed "Seismic Contractor" (which they knew to be SAE) to Global Equipment; identified Madison River Investments and Forza Investments as "50% owner[s]" of Global Equipment and "Limited Partner[s]" in Palmyra Energy; and showed the flow of "Investment Capital" from Palmyra Energy to ASV.

61.     Accordingly, as early as October and no later than December 2015, Hastings, Whiteley, Beatty, and Scott knew that they had caused $12 million to be misappropriated and sent from SAE to Global Equipment via sham transactions, with a portion ultimately going to ASV, which sent almost all of that money back to SAE to pay outstanding invoices.  Indeed,

each of the SAE Executives used the term "round trip" when discussing this flow of funds that resulted in the payment of invoices from ASV to SAE.

62.     In the fall of 2015, at the time the SAE Executives agreed to divert SAE funds through Global Equipment to ASV, Beatty claimed that he did not fully understand, and asked questions about, the import of the term "round trip" and exactly what the use of Global Equipment would accomplish.  To better illustrate the intended flow of funds for Beatty, Hastings and Whiteley created a diagram on a whiteboard for him, in person.  As a result of seeing the diagram, and following the conversation with Hastings and Whiteley, Beatty knew or was reckless in not knowing the nature of the transactions, the meaning of the term "round trip," and the purpose of Global Equipment.

63.     Hastings and Whiteley coordinated each of the transfers from Global Equipment to ASV through the shell companies they created and controlled.

64.     Because the SAE Executives' deceptive and fraudulent conduct was carried out within the scope of their employment, their misconduct and scienter are imputed to SAE.

65.     The below diagram demonstrates the flow of misappropriated funds from SAE to ASV, specifically:

        a.     the misappropriation of $12 million via transfers to Global Equipment;

        b.     the routing of $5.9 million, through shell companies, to ASV; and

        c.     the round tripping of $5.8 million back to SAE in December 2015.

**<u>Round Tripping of Nearly $6 Million in Misappropriated SAE Funds</u>**



**D.   The SAE Executives Simply Pocketed the Remaining Approximately $6 Million of Funds Misappropriated From SAE**

66.     After completing the round tripping of $5.8 million to and from SAE, the SAE Executives simply lined their own pockets with the remainder of the misappropriated funds – approximately $6 million – they had diverted to Global Equipment.  During the Relevant Period, the SAE Executives had discussions with and among each other, by phone and in person, about paying themselves from the portion of the misappropriated funds not indirectly funneled back to SAE.  For instance, Whiteley and Beatty had a one-on-one conversation in Houston during which they discussed keeping the money for themselves.  In addition, during multiple conversations with Whiteley, Beatty told Whiteley of his need for the additional cash in order to, among other things, pay for the construction of a new home in Ottawa.

67.     The SAE Executives accomplished this through (i) direct transfers from Global Equipment and Forza Investments, and (ii) a series of transfers through SSI, yet another shell company controlled by Hastings and Whiteley.

68.     *First*, during the period between October 2015 and November 2017, Whiteley transferred $4.34 million from Global Equipment to himself.  Of that $4.34 million, Whiteley and Hastings agreed to and did transfer $532,620 to Hastings in December 2016, and Whiteley retained the balance.  In addition, on or about December 7, 2015 – three days after the $5.8 million in misappropriated SAE funds were "round tripped" back to SAE – Whiteley transferred $140,000 from Forza Investments to himself.

69.     *Second*, on or about October 5, 2016, Whiteley directed the wiring of approximately $1.376 million from Global Equipment to a TD Ameritrade brokerage account jointly owned by Hastings and his wife, Relief Defendant Lori Hastings.  These funds were

19

intended to reimburse Hastings for his June 2016 purchase of a 2015 SAE senior secured note (the "2015 Note") for $1.1 million.

70.     Hastings purchased the 2015 Note in advance of SAE's 2016 Exchange Offering and ultimately deposited it into a Jeffries brokerage account owned by SSI (the "SSI Account"). Pursuant to Hastings' participation in the 2016 Exchange Offering, he exchanged the 2015 Note for a $1.3 million SAE note dated July 27, 2016 (the "2016 Note") and 109,156 shares of SAE's common stock.

71.     On or about November 8, 2016, Hastings sold the 2016 Note for just over $1 million and deposited the proceeds and the SAE shares into the SSI Account.  Soon thereafter, the SAE Executives agreed to distribute the note proceeds and SAE shares to themselves.

72.     Pursuant to that agreement, Hastings and Whiteley caused the proceeds held in the SSI Account to be distributed to each of the SAE Executives on December 19, 2016, and later on April 4, 2017, after the December 22, 2016 sale of 33,812 additional SAE shares obtained via the 2016 Exchange Offering.  Hastings and Whiteley each received a total of $313,082, and Beatty and Scott each received a total of $219,940.

73.     Hastings' share of the misappropriated funds was sent to the TD Ameritrade brokerage account that he jointly owned with his wife, Relief Defendant Lori Hastings.  In addition, the $532,620 in misappropriated SAE funds that Whiteley transferred to Hastings in December 2016 went to two accounts jointly owned by Jeffrey and Lori Hastings, including the same TD Ameritrade brokerage account.  As such, Relief Defendant Lori Hastings has no legitimate claim to those proceeds, which derived from the Defendants' fraud.

74.     In addition, on July 28, 2017, the vast majority of the remaining unsold SAE shares were transferred from the SSI brokerage account – 40,156 shares to Whiteley, and 14,000 each to Beatty and Scott.  Hastings kept 27,000 shares for himself.

75.     The below diagram demonstrates the SAE Executives' pocketing of the remaining, approximately $6 million in SAE funds, specifically:

      a.      the direct transfers from Global Equipment and Forza Investments to Whiteley and ultimately Hastings; and

      b.      the October 2016 transfer of $1.376 million to Hastings to reimburse SSI's purchase and conversion of SAE notes, the proceeds of which (along with the SAE shares) were subsequently distributed to the SAE Executives from the SSI Account.

**SAE Executives' Theft of the Remaining Approximately $6 Million**



### E.    Whiteley Separately Misappropriated $4 Million From SAE

76.    Separate from the illegal conduct detailed above, Whiteley secretly misappropriated from SAE an additional $4 million between November 2011 and July 2019.

77.    To accomplish this misappropriation, Whiteley created, and submitted to SAE for payment, fake invoices for supposed legal and consulting services provided by fictitious entities, including R.V.I. America Group ("RVI"). He also directed payments owed to legitimate vendors to himself.

78.     Whiteley took advantage of weaknesses and deficiencies in SAE's system of internal accounting controls and personally approved the RVI invoices and corresponding payments, in his capacity as SAE's CFO and General Counsel.

79.     The bank account listed for payment on these invoices was an account controlled by Whiteley and in the name of his then-husband, Relief Defendant Thomas O'Neill.  SAE funds were fraudulently diverted to that bank account as a result of Whiteley's misappropriation. Because Relief Defendant O'Neill does not have a legitimate claim to those misappropriated funds, they constitute ill-gotten gains derived from Whiteley's securities law violations, as alleged in this Complaint.

80.     Based on Whiteley's tolling agreements, discussed further below, approximately $2.8 million of the $4 million misappropriated by Whiteley falls within the applicable limitations period for Whiteley, beginning with the fraudulent misappropriation of $55,000, paid from SAE to RVI on December 18, 2014.  Approximately $2.4 million of the same $4 million falls within the applicable limitations period for O'Neill.

81.     O'Neill also received proceeds related to Defendants' ASV fraud detailed above. Specifically, the illicit payments to Whiteley from Global Equipment, Forza Investments, and SSI all went to bank accounts jointly owned and controlled by Whiteley and O'Neill. Accordingly, O'Neill likewise does not have any legitimate claim to those amounts.

F.  **To Conceal and Further Their Fraud, SAE, Hastings, Whiteley, and Beatty Made Materially False and Misleading Statements In SAE's Public Filings and In Connection With SAE Securities Offerings**

(i)  *SAE's Public Filings Contained Materially False and Misleading Statements*

82.     As a result of Defendants' illegal conduct, SAE's public filings for the period June 30, 2015 through March 31, 2019 contained numerous materially false and misleading statements.

83.     Accordingly, SAE – and Hastings, Whiteley, and Beatty, who signed SAE's filings during that period – made materially false and misleading statements.  As CEO, Beatty, and later (after the first quarter of 2016) Hastings, reviewed and signed SAE's materially false annual and quarterly reports on Forms 10-K and 10-Q, respectively.  Whiteley, as CFO, also reviewed and signed all of those filings, as well as SAE's current reports on Form 8-K, from the second quarter of 2015 through the first quarter of 2019.

84.     SAE's financial statements were materially false because, contrary to Generally Accepted Accounting Principles ("GAAP"), SAE recognized revenue and disclosed accounts receivable balances from ASV as if the revenue and receivables were generated from legitimate, substantive transactions with an unaffiliated company, which Hastings, Whiteley, and Beatty knew was not true.

85.     From the second quarter of 2015 through the second quarter of 2016, SAE recognized $141 million in revenue from ASV.  Of that amount, only $40 million was generated from legitimate end-user licensees.  As a result, SAE materially overstated its revenue by approximately $100 million from the second quarter of 2015 through the second quarter of 2016 – which constituted approximately 36% of SAE's revenue reported in its financial statements for

the period.  Accordingly, SAE's Forms 10-Q for that period and its Forms 10-K for 2015 and 2016 were materially false.

86.     Likewise, SAE's subsequent Forms 10-K and 10-Q, from the third quarter of 2016 through the first quarter of 2019, were also materially false because they either incorporated the artificially-inflated revenue from 2015 and/or 2016 or materially overstated accounts receivable owed by ASV.  For example, SAE's 2017 Form 10-K, signed by Hastings and Whiteley and filed on March 15, 2018, stated: "our largest accounts receivable from one customer was $78.1 million, representing 93% of total consolidated accounts receivable."  That statement was materially false, as ASV was not a legitimate, third-party customer, and therefore the revenue recognized from transactions with ASV was overstated and the associated receivables should not have been booked.

87.     In addition, SAE's Forms 8-K incorporating and attaching SAE's quarterly and annual earnings releases for the period June 2015 through March 2019 – all 16 of which Whiteley signed – were also materially false.  Specifically, the Forms 8-K and corresponding earnings releases for the period Q2 2015 through the end of 2017 included SAE's reported revenue for 2015 and/or 2016 that had been materially overstated due to the improper recording of revenue from SAE's contracts with ASV.  And, the Forms 8-K and corresponding earnings releases for the period Q1 2018 through Q1 2019 included sums due from ASV and, therefore, materially overstated SAE's accounts receivable.

88.     A reasonable investor would have considered important in making his or her investment decision that: (i) SAE's revenue and accounts receivable were significantly overstated due to the improper recording of related-party transactions; and (ii) SAE's CEO,

CFO, and COO, with the substantial assistance of its Executive VP of Operations, had caused SAE to overstate its revenue and receivables and file false public filings with the SEC.

89.     SAE's public filings during the same period, in particular SAE's Forms 10-K and 10-Q, contained the following, additional material misstatements and omissions made by SAE, Hastings, Whiteley, and Beatty:

a.     They materially mischaracterized ASV as a legitimate third-party customer, responsible for large percentages of SAE's revenue.  For example, SAE's 2016 Form 10-K, signed by Hastings and Beatty, identified ASV as a customer accounting for more than 10% in consolidated revenue that year but did not disclose that the revenue was improperly recognized.

b.     They falsely stated that SAE did not own or maintain a multi-client data library, even though Defendants knew ASV, which SAE effectively owned and controlled, was a multi-client data library.  For example, SAE's 2016 Form 10-K falsely stated that SAE "does not acquire data for its own account or for future sale or maintain multi-client data libraries."

c.     They contained materially misleading related party information by failing to disclose or include ASV as a related party.  For example, SAE's 2016 Form 10-K disclosed certain related parties owned and controlled by Hastings but did not identify ASV as a related party created by the SAE Executives and controlled by Hastings or Whiteley.

d.     They contained materially misleading executive-compensation information by failing to include amounts misappropriated by the SAE Executives.  For example, SAE's 2016 Form 10-K incorporated by reference SAE's 2017 Proxy

Statement, which provided 2016 compensation information for the SAE Executives but failed to disclose the amounts each obtained from SAE through the fraudulent use of Global Equipment.  SAE's 2016 Form 10-K likewise failed to include the $342,115 separately misappropriated by Whiteley through the fraudulent payments to RVI in the executive compensation information for 2016.

       e.      They contained materially misleading information regarding SAE's transactions with Global Equipment by, for example, failing to disclose that Global Equipment was a sham rental equipment company created and controlled by the SAE Executives.  For example, SAE's 2015 Form 10-K, signed by Beatty and Whiteley, did not identify Global Equipment as a related party or disclose the approximately $6.8 million paid from SAE to Global Equipment that year.

       f.      They contained materially misleading information regarding SSI.  For example, SAE's Form 10-K for 2016 disclosed that SSI was a related party and was a lender under an SAE loan facility, but misled investors by not disclosing that SSI was a vehicle through which the SAE Executives routed misappropriated SAE funds to pay themselves.  Additionally, although these filings disclosed SSI as a related party owned and controlled by Hastings, they failed to disclose that Whiteley and a junior SAE executive also had ownership interests in SSI.

       g.      Lastly, and significantly, SAE's financial statements improperly included funds misappropriated by the SAE Executives as supposedly legitimate business expenses.  For example, amounts stolen by Whiteley and paid to RVI and other fictitious entities were booked as legal or consulting expenses in SAE's financial statements throughout the Relevant Period.

90.     A reasonable investor would have considered important in making his or her investment decision all of the misstatements contained in SAE's public filings as a result of Defendants' misconduct.

91.     In addition, although Scott did not sign any of the materially false and misleading filings detailed above, he knew or was reckless in not knowing that Defendants' illegal conduct – including, among other facts, that ASV was not a legitimate customer, that SAE funds had been round-tripped back to SAE through ASV, and that the Global Equipment transactions were a sham – rendered SAE's public filings materially false and misleading.  Scott knowingly or recklessly provided substantial assistance to SAE's filing of materially false and misleading periodic reports by creating fake Global Equipment purchase orders and other documents.

*(ii)     Hastings, Whiteley, and Beatty Signed False SOX Certifications*

92.     Likewise, because Hastings, Whiteley, and Beatty knew that the Forms 10-K and 10-Q that each had signed contained the material misstatements and omissions detailed above, their corresponding filing certifications were also materially false and misleading.

93.     During the Relevant Period, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14], required SAE's CEO and CFO, at the time of filing of a report (including reports on Forms 10-K and 10-Q), to sign a certification, pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certification") stating, among other things, that the report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by the report.

94.     In addition, the SOX Certifications required SAE's CEO and CFO, at the time the relevant periodic report was filed, to affirm, among other things that: (i) they were responsible

for establishing and maintaining internal controls over financial reporting; (ii) they designed and evaluated the effectiveness of SAE's internal controls over financial reporting; and (iii) they disclosed to SAE's auditors and Board "[a]ll significant deficiencies and material weaknesses in [SAE's] designing or operation of internal control over financial reporting" and "[a]ny fraud, whether or not material" involving SAE management.

95.     During the Relevant Period, Hastings, Whiteley, and Beatty each signed materially false SOX Certifications.  Each SOX Certification was materially false because, as they knew or were reckless in not knowing at the time they signed the certification, SAE's filings contained numerous, material misstatements, as described above.

96.     These SOX Certifications were also materially false because Hastings, Whiteley, and Beatty had failed to disclose their fraud to SAE's auditors or Board, in contravention of their certifications.  Likewise, these certifications were materially false because each had failed to disclose to SAE's auditors or Board the significant deficiencies and material weaknesses in SAE's internal controls, which they exploited in carrying out and concealing the fraudulent scheme.

97.     Accordingly, each of the SOX Certifications signed by Hastings, Whiteley, and Beatty were materially false, as follows:

      a.     As SAE's CEO, Hastings signed 12 materially false SOX Certifications for SAE's Forms 10-K for 2016 through 2018 and SAE's Forms 10-Q for the period Q2 2016 through Q1 2019.

      b.     As SAE's CFO, Whiteley signed 17 materially false SOX Certifications for SAE's Forms 10-K for 2015 through 2018 (and an amended Form 10-K/A for 2015) and SAE's Forms 10-Q for the period Q2 2015 through Q1 2019.

29

c.      As SAE's CEO, Beatty signed 5 materially false SOX Certifications for SAE's 2015 Form 10-K and amended Form 10-K/A and SAE's Forms 10-Q for the period Q2 2015 through Q1 2016.

(iii)     *SAE's Securities Offering Materials Also Contained Material Misstatements and Omissions*

98.      In addition to SAE's misstated revenue and the other materially false and misleading statements made in SAE's public filings, SAE made materially false and misleading representations (and was substantially assisted by Hastings, Whiteley, Beatty, and Scott) in offering materials and/or purchase agreements in connection with the following SAE securities offerings:

a.      the 2016 Exchange Offering;

b.      a December 2017 exchange offering, pursuant to which SAE offered to exchange its outstanding July 2016 senior secured second lien notes and June 2015 senior secured notes for a combination of newly issued SAE common stock, convertible preferred stock, and warrants to purchase SAE common stock (the "2017 Exchange Offering"); and

c.      a September 2018 offering, pursuant to which SAE issued $60 million of 6% senior secured convertible notes due in 2023 (the "2018 Debt Offering").

99.      Because SAE's offering memorandum for the 2016 Exchange Offer incorporated SAE's financial statements, and its Form 10-K for 2015 and Form 10-Q for the first quarter of 2016, it included all of the misstatements discussed above.

100.      Similarly, SAE's offering memorandum for the 2017 Exchange Offer contained the same material misrepresentations, though it incorporated by reference additional, materially false financial statements and SAE's materially false 2016 Form 10-K.

101.    Lastly, the purchase agreement for the 2018 Debt Offering was materially false because it stated that all reports required to be filed with the SEC, by SAE, contained no untrue statements of material fact, nor omitted to state a material fact required to make the statements not misleading.

**G.    The Above Materially False and Misleading Statements Were Made In Connection With the Purchase and Sale of Securities and In the Offer or Sale of Securities, and SAE Obtained Money or Property By Means of Those False and Misleading Statements**

102.    The materially false and misleading statements alleged in this Complaint occurred in connection with the purchase and sale, and in the offer and sale, of securities.

103.    For the duration of Defendants' fraud, including the making of the materially false and misleading statements alleged in this Complaint, SAE's common stock was actively traded on the NASDAQ.  SAE, Hastings, Whiteley, and Beatty made these materially false and misleading statements in public filings with the SEC.

104.    In addition, SAE conducted multiple offerings of SAE securities during the Relevant Period, including the 2016 Exchange Offering, 2017 Exchange Offering, and 2018 Debt Offering.  These offers and sales took place at a time when SAE's periodic reports, including its Forms 10-K, 10-Q, and 8-K contained materially false and misleading statements.

105.    Moreover, as described above, SAE's offering materials prepared in connection with the 2016 and 2017 Exchange Offerings also contained materially false and misleading statements.

106.    In addition, SAE obtained money or property by means, and as a result, of the materially false and misleading statements contained in its public filings and securities offering materials.

107.    During the Relevant Period, SAE issued millions of shares of its common stock, which were artificially inflated as a result of Defendants' fraudulent misstatements and omissions.  SAE issued those artificially-inflated shares via its securities offerings, in exchange for debt, as share-based compensation, and as payment for services.

108.    For example, as a result of the 2016 Exchange Offering, SAE issued 6.4 million shares of its common stock, valued by the Company at $65 million.  At the time, SAE's stock price was artificially inflated as a result of SAE's materially false financial statements and public filings, both of which were incorporated into the relevant exchange offering memorandum. Therefore, as a result of the 2016 Exchange Offering, SAE obtained money or property by means of its materially false financial statements and public filings.

109.    Similarly, via the 2017 Exchange Offering, SAE issued 812,321 common shares, all of which were artificially inflated by, and as a result of, Defendants' fraudulent misstatements and omissions.  Therefore, SAE obtained money or property by means of its materially false and misleading financial statements and public filings.

110.    Hastings, Whiteley, and Beatty, by signing and causing SAE to file public filings that each knew, or was reckless in not knowing, contained materially false and misleading statements, substantially assisted SAE in obtaining money or property via SAE's securities offerings and share issuances during the Relevant Period.  In addition, Scott, although he did not sign SAE's public filings, knew or was reckless in not knowing that Defendants' fraud and its impact on SAE's revenue and books were not being disclosed to investors, in connection with SAE securities offerings.  Scott provided substantial assistance to SAE in obtaining money or property via materially false public filings and SAE securities offerings by, among other things,

creating fake Global Equipment purchase orders and other documents used to conceal and further Defendants' fraud.

### H. To Conceal Their Misconduct, Hastings, Whiteley, and Beatty Also Lied to SAE's Auditors

111.    Hastings, Whiteley, and Beatty lied to SAE's auditors in connection with audits and reviews of SAE during the Relevant Period.

112.    Specifically, Whiteley, Hastings, and Beatty signed management representation letters to SAE's auditors that each knew contained material misstatements.

113.    For example, Beatty and Whiteley signed a March 15, 2016 management representation letter in which they made the following material misstatements:

    a.    that SAE's financial statements conformed with GAAP, even though Beatty and Whiteley knew, or were reckless in not knowing, SAE's financial statements contained numerous misstatements inconsistent with GAAP;

    b.    that they had no knowledge of any fraud affecting SAE and involving management, despite their knowledge of and participation in a massive fraud involving millions of dollars in misappropriated funds; and

    c.    that they had made available to SAE's auditors "the names of all relationships and transactions with related parties" deliberately refusing to disclose to SAE's auditors the identity of, and SAE's transactions with, ASV and Global Equipment, which each knew were related parties; and

    d.    that as of December 31, 2015, accounts receivable were due to SAE from a purportedly legitimate "customer" (ASV) that each knew, or was reckless in not knowing, was in truth a related party that SAE controlled.

114.    The other 15 management representation letters, all of which Whiteley signed and 11 of which Hastings signed, contained the same or substantially similar material misrepresentations.

       **I.**    **Hastings, Whiteley, Beatty, and Scott Took Additional Steps to Conceal Their Misconduct**

115.    Hastings, Whiteley, Beatty, and Scott also took steps to conceal their misconduct from SAE's outside counsel, which was conducting an internal investigation, and from the SEC, which as of the fall of 2017 was investigating SAE's recognition of revenue from and booking of receivables owed by ASV.

116.    On November 1, 2017, the SEC, as part of its investigation, sent SAE a request for documents.  During the process of SAE collecting potentially responsive documents and producing them to the SEC, Beatty, Hastings, and Whiteley had at least two in-person meetings and phone conversations about the Company's planned response to the document request. During one of these conversations with Hastings, and Whiteley, Beatty discouraged Hastings and Whiteley from producing any documents related to Global Equipment.  In another conversation among Whiteley, Hastings, and Beatty, Beatty and Hastings expressed concerns about the SEC inquiry and conveyed that they wanted SAE's response to steer clear of ASV and Global Equipment in order to conceal the true ownership of both entities.  SAE did not produce documents related to Global Equipment in its initial response to the SEC's November 1, 2017 document request.

117.    The SEC's investigation eventually prompted SAE to conduct its own internal investigation, and the Company hired outside counsel to do so.  In early August 2019, each of the SAE Executives was due, in a matter of days, to be interviewed by SAE's outside counsel in

connection with the Company's internal investigation, which was focused, among other topics, on ASV and Global Equipment.

118.    In advance of those interviews, Hastings requested, and Whiteley, Beatty, and Scott agreed, to meet at a hotel in Toronto to discuss and coordinate their answers for the upcoming interviews by the Company's outside counsel.

119.    Hastings, Whiteley, Beatty, and Scott met at or around 9 a.m. on Tuesday, August 6, 2019, in the breakfast area of, and then in Hastings' room at, the Sheraton Gateway Hotel adjacent to the Toronto airport.

120.    During this meeting, Hastings, Whiteley, Beatty, and Scott reviewed a binder of key documents prepared by SAE's outside counsel and provided in advance of their scheduled interviews.  They discussed how they could explain SAE's relationships with ASV and Global Equipment.

121.    Hastings proposed, and Whiteley, Beatty, and Scott each agreed to, a cover story—to be told during their upcoming interviews—that the $12 million SAE had transferred to Global Equipment was for legitimate business purposes.  Specifically, Hastings suggested that, as a result of a purported August 5, 2011 assignment agreement between SAE and another company Hastings owned, he had contractual rights to rent certain equipment owned by SAE back to SAE (*i.e.*, the equipment that was supposedly rented by Global Equipment to SAE) and was entitled to a 5% transfer fee worth $12 million.  This explanation was not true, as Hastings, Whiteley, Beatty, and Scott knew, or were reckless in not knowing.  For one, no such agreement was ever disclosed in SAE's public filings.  In addition, upon information and belief, there are no contemporaneous records, including electronic copies of the agreement (or drafts thereof) to show the existence of any assignment agreement between SAE and the other company.

35

122.     After Hastings proposed the cover story involving his contractual rights to a 5%

transfer fee, Beatty referred to SAE's relationship with and use of Global Equipment as

"criminal" and asked the other SAE Executives whether their agreed-upon cover story would get

the four of them out of trouble.

**J.     SAE's Board Learned Of Defendants' Fraud and Restated the Company's Financial Statements**

123.     On August 16, 2019, SAE filed with the SEC a current report on Form 8-K

disclosing, for the first time, that SAE had a controlling financial interest in ASV and it should

have been treated for accounting purposes as a variable interest entity of SAE, which

necessitated SAE's consolidation of ASV's financial statements for the quarterly and annual

periods from June 30, 2015 through March 31, 2019.  In addition, that current report announced

the SAE Board's determination that SAE's financial statements contained errors and required

restatement and should no longer be relied upon.  The current report also disclosed that the SEC

had been conducting an investigation of SAE "relating to revenue recognition, accounts

receivable, tax credits, and other related matters."

124.     The same current report also announced the Board's decision to terminate

Whiteley's employment and place Hastings on administrative leave.  Later, Hastings resigned,

and in December 2019, SAE's Board terminated Beatty's employment.  Scott resigned from the

Company on September 14, 2020.

125.      Following the filing of its current report with the SEC, SAE's trading volume

spiked and its stock price dropped by approximately 32% – from a closing price of $3.25 per

share on August 15, 2019, to a closing price of $2.22 per share the next day.

126.    On February 7, 2020, SAE filed an amended annual report on Form 10-K/A and an amended quarterly report on Form 10-Q/A restating its financial statements for June 30, 2015 through March 31, 2019.

127.    On June 17, 2020, NASDAQ suspended trading in SAE's common stock, and the stock began trading on over-the-counter markets.  On August 21, 2020, NASDAQ delisted SAE's common stock.

128.    On August 27, 2020, SAE and various affiliates filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

**K.    Defendants Entered Into Tolling Agreements With the SEC**

129.    Each of the Defendants has entered into agreements with the SEC in which they agreed to toll, for various periods and various lengths of time, any statute of limitations applicable to the conduct and claims alleged herein.  SAE's three tolling agreements cover the period between August 22, 2019 and December 31, 2020; Hastings' three tolling agreements cover the period between August 27, 2019 and December 31, 2020; Whiteley's five tolling agreements cover the period between August 22, 2019 and October 23, 2020; Beatty's three tolling agreements cover the period between August 30, 2019 and December 31, 2020; and Scott's three tolling agreements cover the period between August 30, 2019 and December 31, 2020.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder
### (Defendants Hastings, Whiteley, Beatty, and Scott)

130.     The SEC repeats and realleges paragraphs 1 through 129, as though fully set forth

herein.

131.     By reason of the foregoing, Defendants, directly or indirectly, by the use of the

means and instrumentalities of interstate commerce or of the mails, in connection with the

purchase or sale of securities: employed devices, schemes, or artifices to defraud; and/or engaged

in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

132.     Defendants acted with scienter and engaged in the referenced conduct knowingly

and/or recklessly.

133.     By engaging in the conduct described above, Defendants violated, and unless

restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §

78j(b)], and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) & (c)].

## SECOND CLAIM FOR RELIEF
### Aiding and Abetting Violations of Exchange Act Section 10(b) and Rules 10b-5(a) and (c) Thereunder
### (Defendants Hastings, Whiteley, Beatty, and Scott)

134.     The SEC realleges and incorporates by reference paragraphs 1 through 129, as

though fully set forth herein.

135.     Based on the conduct described above, Hastings, Whiteley, Beatty, and Scott,

knowingly or recklessly provided substantial assistance to SAE in its violations of Section 10(b)

of the Exchange Act and Rules 10b-5(a) and 10b-5(c) thereunder.

136.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act

[15 U.S.C. § 78t(e)], Hastings, Whiteley, Beatty, and Scott aided and abetted SAE's violations,

and unless restrained and enjoined will again aid and abet violations, of Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) & (c)].

### THIRD CLAIM FOR RELIEF
**Violations of Exchange Act Section 10(b) and Rule 10b-5(b) Thereunder**
**(Defendants Hastings, Whiteley, and Beatty)**

137.    The SEC repeats and realleges paragraphs 1 through 129, as though fully set forth herein.

138.    By reason of the foregoing, SAE, Hastings, Whiteley, and Beatty, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

139.    Hastings, Whiteley, and Beatty, and as such SAE, acted with scienter and engaged in the referenced conduct knowingly and/or recklessly.

140.    By engaging in the conduct described above, SAE, Hastings, Whiteley, and Beatty violated, and unless restrained and enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### FOURTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 10(b) and Rule 10b-5(b)**
**Thereunder**
**(Defendants Hastings, Whiteley, Beatty, and Scott)**

141.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

142.    Based on the conduct described above, Hastings, Whiteley, Beatty, and Scott, knowingly or recklessly provided substantial assistance to SAE in its violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

143.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Hastings, Whiteley, Beatty, and Scott aided and abetted SAE's violations, and unless restrained and enjoined will again aid and abet violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

**FIFTH CLAIM FOR RELIEF**
**Violations of Securities Act Sections 17(a)(1) and (3)**
**(Defendants Hastings, Whiteley, Beatty, and Scott))**

144.     The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

145.     By reason of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants employed devices, schemes, or artifices to defraud; and/or engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

146.     With regard to Defendants' violations of Section 17(a)(1) of the Securities Act, Defendants acted with scienter and engaged in the referenced conduct knowingly and/or with recklessness.  With regarding to Defendants' violations of Section 17(a)(3) of the Securities Act, Defendants acted at least negligently and engaged in the referenced conduct without exercising reasonable care.

147.     By engaging in the conduct described above, Defendants, directly or indirectly violated, and unless enjoined will again violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1) & (3)].

### SIXTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Securities Act Sections 17(a)(1) and (3)**
**(Defendants Hastings, Whiteley, Beatty, and Scott)**

148.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

149.    Based on the conduct described above, Hastings, Whiteley, Beatty, and Scott knowingly and/or recklessly provided substantial assistance to SAE in its violations of Section 17(a)(1) and (3) of the Securities Act.

150.    By reason of the foregoing, and pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Hastings, Whiteley, Beatty, and Scott aided and abetted SAE's violations, and unless restrained and enjoined will again aid and abet violations, of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) & (3)].

### SEVENTH CLAIM FOR RELIEF[2]
**Aiding and Abetting Violations of Securities Act Section 17(a)(2)**
**(Defendants Hastings, Whiteley, Beatty, and Scott)**

151.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

152.    Based on the conduct described above, Hastings, Whiteley, Beatty, and Scott knowingly or recklessly provided substantial assistance to SAE in its violations of Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

153.    By reason of the foregoing, and pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Hastings, Whiteley, Beatty, and Scott aided and abetted SAE's violations,

---

[2] The Seventh, Ninth, and Eleventh Claims for Relief in Plaintiff's original complaint were against SAE for violations of Securities Act Section 17(a)(2), Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder, and Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B), respectively.  ECF No. 1.  Those claims were resolved by the Final Judgment entered against SAE.  ECF No. 44.

and unless restrained and enjoined will again aid and abet violations, of Section 17(a)(2) of the

Securities Act [15 U.S.C. § 77q(a)(2)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Section 13(a) and Rules 12b-20, 13a-1, 13a-11, and 13a-13 Thereunder
(Defendants Hastings, Whiteley, Beatty, and Scott)**

154.     The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

155.     As alleged above, SAE failed to file truthful and correct annual, quarterly, and current reports with the SEC, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, & 240.13a-13].  In addition, SAE failed to include or disclose material information in its required reports as necessary to make the required statements, in light of the circumstances under which they were made, not misleading, in violation of Exchange Act Rule 12b-20 [17 C.F.R. § 240.12b-20].

156.     As detailed above, Hastings, Whiteley, and Beatty knew or were reckless in not knowing that SAE's periodic reports on Forms 10-K, 10-Q, and 8-K were not truthful and accurate, in violation of Section 13(a) of the Exchange Act and the rules thereunder.  Each knowingly or recklessly provided substantial assistance to SAE's violations by reviewing, approving, and/or signing Forms 10-K, 10-Q, and 8-K that each knew were untruthful and inaccurate and/or failed to disclose required material information, before those reports were filed with the SEC.

157.     In addition, Scott knew or was reckless in not knowing that Defendants' fraud was not being disclosed to investors, either in SAE's public filings or in connection with SAE

securities offerings.  Scott knowingly or recklessly provided substantial assistance to SAE's reporting violations by, *inter alia*, creating fake purchase orders and other documents.

158.     By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] Hastings, Whiteley, Beatty, and Scott aided and abetted SAE's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, & 240.13a-13], and unless enjoined will again aid and abet such violations.

### NINTH CLAIM FOR RELIEF
**Aiding and Abetting Violations of Exchange Act Sections 13(b)(2)(A) and 13(b)(2)(B)**
**(Defendants Hastings, Whiteley, Beatty, and Scott)**

159.     The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

160.     By reason of the conduct described above, SAE violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].

161.     As alleged herein, Hastings, Whiteley, Beatty, and Scott knowingly or recklessly provided substantial assistance to and thereby aided and abetted SAE's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].

162.     Each of Hastings, Whiteley, Beatty, and Scott caused SAE to improperly account for the Global Equipment and ASV transactions in SAE's accounts.  By and through the same conduct, each substantially assisted SAE's failure to maintain sufficient internal controls.  In addition, as alleged herein, each took advantage of SAE's weak controls to further and conceal their misconduct and divert SAE funds to themselves.

163.    By reason of the foregoing, and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Hastings, Whiteley, Beatty, and Scott aided and abetted SAE's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) & (b)(2)(B)].

**TENTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 13(b)(5) and Rule 13b2-1 Thereunder**
**(Defendants Hastings, Whiteley, Beatty, and Scott)**

164.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

165.    Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1] provide that "[n]o person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any issuer book, record, or account."

166.    Hastings, Whiteley, Beatty, and Scott knowingly circumvented or knowingly failed to implement a system of internal accounting controls that SAE was required to maintain under Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].  In addition, Hastings, Whiteley, Beatty, and Scott, directly or indirectly, falsified or caused to be falsified SAE's books, records, or accounts subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

167.    By reason of the foregoing, Hastings, Whiteley, and Beatty repeatedly violated, and unless enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

### ELEVENTH CLAIM FOR RELIEF
**Violations of Exchange Act Rule 13b2-2**
**(Defendants Hastings, Whiteley, and Beatty)**

168.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

169.    By reason of the foregoing, Hastings, Whiteley, and Beatty, directly or indirectly, made materially false and misleading statements and omitted to state, or caused others to omit to state, material facts necessary in order to make the statements, in light of the circumstances under which the statements were made, not misleading in connection with audits, reviews, and examinations of SAE's financial statements and preparation and filing of documents required to be filed with the SEC.

170.    As detailed above, Hastings, Whiteley, and Beatty lied to SAE's external auditors, in connection with audits and reviews of SAE for the second quarter of 2015 through the first quarter of 2019, by signing management representation letters that each knew or was reckless in not knowing contained material misstatements, including that SAE's financial statements conformed with GAAP and that each had no knowledge of any fraud affecting SAE or involving SAE management.

171.    By reason of the foregoing, Hastings, Whiteley, and Beatty violated Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

### TWELFTH CLAIM FOR RELIEF
**Violations of Exchange Act Rule 13a-14**
**(Defendants Hastings, Whiteley, and Beatty)**

172.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

173.     Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14] requires that each principal executive and principal financial officer of an issuer, at the time of filing of a report, including reports on Form 10-K and 10-Q, must sign a certification at the time of the filing averring, among other things, that the report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report, and as to the company's internal controls over financial reporting.

174.     As detailed above, Hastings, Whiteley, and Beatty signed materially false and misleading certifications on SAE's periodic reports on Forms 10-K and 10-Q during the Relevant Period.

175.     By reason of the foregoing, Hastings, Whiteley, and Beatty repeatedly violated, and unless enjoined will again violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

**THIRTEENTH CLAIM FOR RELIEF**
**Violations of Section 304(a) of the Sarbanes-Oxley Act of 2002**
**(Defendants Hastings, Whiteley, and Beatty)**

176.     The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

177.     Section 304(a) of the Sarbanes-Oxley Act of 2002 ("SOX") requires the chief executive officer and chief financial officer of any issuer required to prepare an accounting restatement due to material non-compliance with the securities laws as a result of misconduct to reimburse the issuer for (1) any bonus, incentive-based, or equity-based compensation received by that person from the issuer during the 12-month periods following the false filings, and (2) any profits realized from the sale of the issuer's securities during those 12-month periods.

178.    SAE, as a result of misconduct, filed periodic reports from the second quarter of 2015 through the first quarter of 2019 that were in material non-compliance with financial reporting requirements under the securities laws.

179.    Due to SAE's material non-compliance with its financial reporting requirements, SAE was required to prepare a restatement of its financial statements for fiscal years 2015, 2016, 2017, and 2018 and each fiscal quarter beginning with the quarter ended June 30, 2015 through the quarter ended March 31, 2019.

180.    During SAE's period of material non-compliance, Whiteley was SAE's CFO, and Beatty was SAE's CEO until August 2016, after which Hastings was SAE's CEO.

181.    Hastings, Whiteley, and Beatty received bonuses, incentive-based compensation, equity-based compensation, and/or proceeds from the sale of SAE stock in the 12-month periods following each of SAE's materially false periodic reports filed during the Relevant Period.

182.    Hastings, Whiteley, and Beatty have not reimbursed SAE for any portion of this compensation or those stock-sale proceeds.

183.    The SEC has not exempted Hastings, Whiteley, or Beatty, pursuant to SOX Section 304(b) [15 U.S.C. § 7243(b)], from the application of SOX Section 304(a) [15 U.S.C. § 7243(a)].

184.    Accordingly, Hastings, Whiteley, and Beatty violated, and unless ordered to comply will continue to violate, SOX Section 304(a) [15 U.S.C. § 7243(a)].

## FOURTEENTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Relief Defendant Thomas O'Neill)

185.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

186.    Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the SEC under any provision of the securities laws, the SEC may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

187.    As described above, Relief Defendant Thomas O'Neill received funds and assets that were the proceeds, or are traceable to the proceeds, of Defendants' fraud, including (i) the illicit payments from Global Equipment, Forza Investments, and SSI to Whiteley, as alleged above, and (ii) approximately $2.4 million of the at least $4 million Whiteley separately misappropriated from SAE.  These fraud proceeds were diverted by Whiteley and others to bank accounts owned and controlled jointly by Whiteley and O'Neill.  Therefore, O'Neill has no legitimate claim to the fraud proceeds routed to those bank accounts.

188.    O'Neill obtained the funds and assets in connection with Defendants' securities law violations alleged in this Complaint and under circumstances in which it is not just, equitable, or conscionable for him to retain the funds and property.  As such, O'Neill was unjustly enriched as a result of Defendants' fraud.

**FIFTEENTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Relief Defendant Lori Hastings)**

189.    The SEC realleges and incorporates by reference paragraphs 1 through 129, as though fully set forth herein.

190.    Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)] states: "In any action or proceeding brought or instituted by the SEC under any provision of the securities laws, the SEC may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors."

191.    As described above, Relief Defendant Lori Hastings received funds and assets

that were the proceeds, or are traceable to the proceeds, of the fraud alleged in this Complaint.

Specifically, as alleged above, $1.376 million of the $12 million misappropriated from SAE was

routed from Global Equipment to a TD Ameritrade account jointly owned by Hastings and Lori

Hastings, and Hastings' share of the 2016 Note proceeds was transferred from the SSI Account

to the same TD Ameritrade brokerage account on December 19, 2016 and April 4, 2017.  In

addition, as alleged above, the $532,620 in misappropriated SAE funds that Whiteley transferred

to Hastings in December 2016 also went to accounts jointly owned and controlled by Jeffrey and

Lori Hastings, including the same TD Ameritrade brokerage account.  As such, Lori Hastings

has no legitimate claim to the fraud proceeds routed to those accounts.

192.    Lori Hastings obtained the funds and assets in connection with Defendants'

securities law violations alleged in this Complaint and under circumstances in which it is not

just, equitable, or conscionable for her to retain the funds and property.  As such, Lori Hastings

was unjustly enriched as a result of Defendants' fraud.

### PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court enter Final Judgments:

### I.

Finding that Defendants violated the statutes and rules set forth in this Complaint as to

each;

### II.

Permanently restraining and enjoining Defendants, and all persons in active concert or

participation with them, from violating, directly or indirectly, the statutes and rules set forth in

this Complaint as to each;

**III.**

Ordering Defendants Hastings, Whiteley, Beatty, and Scott, and Relief Defendants

O'Neill and Hastings, to disgorge, with prejudgment interest, all ill-gotten gains or unjust

enrichment derived from Defendants' illegal conduct as set forth in this Complaint;

**IV.**

Ordering Defendants Hastings, Whiteley, Beatty, and Scott to pay civil penalties pursuant

to Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Section 20(e) of the Securities

Act [15 U.S.C. § 77t(e)];

**V.**

Ordering Defendants Hastings, Whiteley, and Beatty, in a form consistent with Fed. R.

Civ. P. 65(d), to reimburse SAE for their bonuses, incentive-based, equity-based compensation,

and proceeds from the sale of SAE securities, pursuant to Section 304 of the Sarbanes-Oxley Act

of 2002 [15 U.S.C. § 7243];

**VI.**

Permanently barring each of Defendants Hastings, Whiteley, Beatty, and Scott from

acting as an officer or director of any issuer that has a class of securities registered pursuant to

Section 12 of the Exchange Act [15 U.S.C. § 78l] and that is required to file reports under

Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the

Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §

78u(d)(2)]; and

**VII.**

Granting such other and further relief as this Court may deem just, equitable, or necessary

for the benefit of investors.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff SEC demands that this case be tried to a jury.

Dated: January 18, 2023        Respectfully submitted,

                              */s/ Peter Lallas*
                              Peter Lallas (PL-2965)
                              Nicholas C. Margida (admitted *pro hac vice*)
                              S. Yael Berger (admitted *pro hac vice*)
                              U.S. Securities and Exchange Commission
                              100 F Street, N.E.
                              Washington, DC 20549-5041
                              (202) 551-6864 (Lallas)
                              E-mail:  LallasP@sec.gov
                              *Counsel for Plaintiff Securities and Exchange Commission*